Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMIR SITABKHAN, derivatively on behalf of STAAR SURGICAL COMPANY, | Case No.: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| CAREN L. MASON, DEBORAH ANDREWS, PATRICK F. WILLIAMS, STEPHEN C. FARRELL, JOHN C. MOORE, and LOUIS E. SILVERMAN, | |
| Defendants, | |
| and | |
| STAAR SURGICAL COMPANY, | |
| Nominal Defendant. | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **INTRODUCTION**

Plaintiff Amir Sitabkhan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant STAAR Surgical Company ("STAAR" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Caren L. Mason, Deborah Andrews, Patrick F. Williams, Stephen C. Farrell, John C. Moore, and Louis E. Silverman, (collectively, the "Individual Defendants," and together with STAAR, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of STAAR, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding STAAR, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by STAAR's directors and officers from February 26, 2020 through the present (the "Relevant Period").

2.  STAAR is a surgical eye company that designs, develops, manufactures, and sells implantable lenses and delivery systems for those lenses. With a focus on ophthalmic surgery for over 30 years, STAAR is the leading manufacturer of lenses used in corrective or "refractive" surgeries to improve vision, and make lenses for use in cataract surgeries.

3.  The Company's two primary products are systems used to deliver the lenses into the eye. STAAR's primary products are "implantable Collamer® lenses," or "ICLs," used in refractive surgery, intraocular lenses, or "IOLs," used in cataract surgery. According to an analyst report, ICL surgery is about three times as expensive as LASIK, which is more common.

4.  Throughout the Relevant Period, the Individual Defendants caused the Company to consistently make statements in the Company's SEC filings and press releases that misrepresented the Company's business operations, prospects, and compliance, particularly with respect to its sales in China. While the Company's SEC filings purported to accurately disclose, among other things, its financial results, the Company was actually overstating its sales and growth in China, and hiding those false profits as overstatements of marketing and research and development expenses, enabling insiders to unjustly enrich themselves to the detriment of the Company and its shareholders.

5.  STAAR started to reveal the truth to the public on August 5, 2020, when the Company published disappointing financial results. On that news, the price of the Company's stock dropped from $61.81 per share at the close of the previous trading day on August 5, 2020, to $55.86 at the close of trading on August 6, 2020, a drop of almost 10%. However, the truth was fully revealed a few days later on August 11, 2020, when J Capital Research published a report disclosing that it believed STAAR had overstated its sales in China by $21.6 million, meaning that ***all of the Company's profits in 2019 were fake*** (the "J Capital Report").

6.     On this news, the price of the Company's stock continued to fall, from $51.42 per share at the close of the previous trading day on August 10, 2020, to $48.25 at the close of trading on August 11, 2020.

7.     In further breach of their fiduciary duties during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make to the investing public a series of materially false and misleading statements about STAAR's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that STAAR was (1) overstating its sales and growth in China, which profits were being hidden as (2) overstatements of marketing and research and development expenses, and (3) that the Company failed to maintain internal controls. As a result of the foregoing, STAAR's public statements were materially false and misleading at all relevant times.

8.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to continuously fail to maintain adequate internal controls throughout the duration of the Relevant Period, including by not utilizing an independent auditor in China.

10.     Furthermore, one of the Individual Defendants breached her fiduciary duties by engaging in improper insider sales, obtaining proceeds of $22,868.

11.     In light of the Individual Defendants' misconduct, which has subjected STAAR, its Chief Executive Officer ("CEO"), its current Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake

internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of STAAR's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, 17 C.F.R. § 240.10b-5, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f).

14.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Verified Shareholder Derivative Complaint

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because STAAR and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of STAAR common stock. Plaintiff has continuously held STAAR common stock at all relevant times.  Plaintiff is a citizen of the State of Texas.

### Nominal Defendant STAAR

22.     STAAR is a Delaware corporation with its principal executive offices located at 25651 Atlantic Ocean Drive, Lake Forest, California, 92630. STAAR's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "STAA."

### Defendant Mason

23.     Defendant Caren L. Mason ("Mason") has been the President and CEO of STAAR since March 1, 2015, and has served as a member of the Board since 2014. According to the Company's Schedule 14A filed with the SEC on July 20, 2020 (the

"2020 Proxy Statement"), as of June 1, 2020, Defendant Mason beneficially owned 899,336 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 1, 2020 was $39.73, Defendant Mason owned approximately $35.7 million worth of STAAR stock.

24.     Defendant Mason's employment agreement provides for an annual salary of $525,000, with eligibility to receive an annual incentive target bonus equal to up to 75% of her base salary, at the discretion of the Compensation Committee of the Board of Directors based on meeting certain goals. Defendant Mason is eligible for periodic equity awards at the discretion of the Board.

25.     The Company's 2020 Proxy Statement stated the following about Defendant Mason:

> *Background*. Ms. Mason was elected to STAAR's Board of Directors at its 2014 Annual Meeting, and she has served as STAAR's Chief Executive Officer since March 1, 2015. From 2010 to 2012, Ms. Mason served as Chief Executive Officer of Verinata Health, Inc. (f/k/a Artemis Health, Inc.), a provider of non-invasive prenatal genetic sequencing tests for the early identification of fetal chromosomal abnormalities. In February 2013, Verinata was acquired by Illumina. Ms. Mason served as the President, Chief Executive Officer and a Director of Quidel Corporation from 2004 to 2009, a publicly traded company engaged in the development, manufacturing and marketing of rapid diagnostic solutions at the professional point of care in infectious diseases and reproductive health. Prior to joining Quidel, Ms. Mason provided consultative services from 2003 to 2004 for Eastman Kodak Health Imaging as a result of the sale of MiraMedica, Inc., to Eastman Kodak. She served as President and Chief Executive Officer for MiraMedica, Inc., an early phase start-up developing computer aided detection software for breast cancer, from 2002 through 2003. Prior to her tenure with MiraMedica, Inc., Ms. Mason served as Chief Executive Officer of eMed Technologies of Lexington, Massachusetts, a teleradiology and picture archiving and communications systems business. Ms. Mason served as General Manager of the Women's Healthcare business and as a General Manager in various capacities for the Services business of General Electric Healthcare from 1996 to 2000. Ms. Mason's additional healthcare experience includes her tenure with Bayer AG/AGFA from 1989 to 1996 where she last held the positions of Senior Vice President for Bayer Corporate Health Care and Senior Vice President for the AGFA Technical Imaging Business Group. Ms. Mason began her career in healthcare with American Hospital Supply/Baxter Healthcare in sales,

marketing and managerial roles from 1977 through 1988. Ms. Mason received her B.A. from Indiana University. Ms. Mason's prior corporate governance experience includes both private and public boards with Verinata Health, eMed Technologies, MiraMedica and Quidel Corporation. She currently serves as a director on the Board of The Medical Device Manufacturers Association, MDMA, a medical device trade association headquartered in Washington, D.C., and on the Advisory Board for InDevR, Inc., a biotechnology company in Boulder, Colorado developing diagnostic and vaccine technologies. Ms. Mason also serves on the Board of Directors of the ASCRS Foundation and the ICO Foundation, both of which are global nonprofit organizations focused on humanitarian eye care and education.

*Qualifications*. The Board of Directors concluded that in addition to her broad healthcare background and medical device company expertise, Ms. Mason, STAAR's Chief Executive Officer, should serve on its Board of Directors to provide a critical link between management and our Board. Before Ms. Mason became Chief Executive Officer, in 2014 the Board nominated her to serve as an independent director. Ms. Mason has nearly 35 years of senior executive experience at innovative healthcare, life sciences, diagnostic technology, and medical device companies.

26. Upon information and belief, Defendant Mason is a citizen of the State of California.

**Defendant Andrews**

27. Defendant Deborah Andrews ("Andrews") was the CFO of STAAR until July 2020. Defendant Andrews also served as STAAR's interim CFO from April 2017 to September 2017, Vice President/CFO from August 2005 to September 2013, and various other positions since 1995. According to the Company's 2020 Proxy Statement, as of June 1, 2020, Defendant Andrews beneficially owned 43,624 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 1, 2020 was $39.73, Defendant Andrews owned approximately $1.7 million worth of STAAR stock.

28. Defendant Andrews' employment agreement provides for an annual salary of $335,000, with eligibility to receive an annual incentive target bonus equal to up to 45% of her base salary, at the discretion of the Compensation Committee of the Board of

Directors based on meeting certain goals, and was granted 25,000 stock options and 12,500 restricted stock units ("RSUs") of STAAR.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Andrews made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 3/23/2020 | 834 | $27.42 | $22,868 |

30.     Thus, in total, before the fraud was exposed, she sold 834 Company shares on inside information, for which she received approximately $22,868. Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

31.     The Company's 2020 Proxy Statement stated the following about Defendant Andrews:

> Ms. Andrews has served as Chief Financial Officer since September 2017. From April 2017 to September 2017 she served as STAAR's interim Chief Financial Officer. Prior to that, from September 2013 to April 2017, she served as Chief Accounting Officer. From August 2005 to September 2013 she served as STAAR's Vice President, Chief Financial Officer. She has been employed by STAAR since 1995, serving as Principal Financial Officer from April 2005 to August 2005, Global Controller from 2001 to 2005, Vice President, Finance, of STAAR Surgical AG (Switzerland) from 1999 to 2001, and Assistant Controller from 1995 to 1999. She previously served as an internal auditor for Bourns, Inc., a maker of electronic components, from 1994 to 1995, and an auditor for KPMG Peat Marwick from 1991 to 1994. Since April 2014 she has served on the Board of Directors and Audit and Compensation Committees of Lineage Cell Therapeutics, formerly known as BioTime, Inc. Ms. Andrews earned her B.S. in Accounting from California State University, San Bernardino.

32.     Upon information and belief, Defendant Andrews is a citizen of the State of California.

**Defendant Williams**

33.     Defendant Patrick F. Williams ("Williams") is the current CFO of STAAR.

34.     The Company's website[1] stated the following about Defendant Williams:

> Mr. Williams was appointed Chief Financial Officer in July 2020. From 2016 to 2019, he served as the Chief Financial Officer of Sientra, Inc. before transitioning to General Manager for its miraDry® business unit. Prior to that, from 2012 to 2016, Mr. Williams served as Chief Financial Officer of ZELTIQ Aesthetics, Inc., a publicly-traded medical device company that was acquired by Allergan. Previously, Mr. Williams served as Vice President in finance, strategy and investor relations roles from 2007 to 2012 at NuVasive, Inc., a San-Diego based medical device company. He has also held finance roles with Callaway Golf and Kyocera Wireless. Mr. Williams received an MBA in Finance and Management from San Diego State University and a Bachelor of Arts in Economics from the University of California, San Diego.

35.     According to current report filed on Form 8-K on July 6, 2020, Defendant Williams' employment agreement provides for an annual salary of $395,000, with eligibility to receive an annual incentive target bonus equal to up to 50% of his base salary, at the discretion of the Compensation Committee of the Board of Directors based on meeting certain goals.

36.     Upon information and belief, Defendant Williams is a citizen of the State of California.

**Defendant Farrell**

37.     Defendant Stephen C. Farrell ("Farrell") has served on the Board of STAAR since January 2016, and also serves as Chairman of Audit Committee and as a member of Nominating and Governance Committee. According to the Company's 2020 Proxy Statement, as of June 1, 2020, Defendant Farrell beneficially owned 73,602 shares of the Company's common stock. Given that the price per share of the Company's common

---

[1] https://investors.staar.com/investor-resources-and-faqs/corporate-governance/default.aspx#officers.

Verified Shareholder Derivative Complaint

stock at the close of trading on June 1, 2020 was $39.73, Defendant Farrell owned approximately $2.9 million worth of STAAR stock.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Farrell:

> *Background.* Mr. Farrell has served since 2011 as the Chief Executive Officer and a member of the Board of Directors of Convey Health Solutions, a private equity sponsored technology-enabled healthcare business process outsourcer. Also, since 2012 he has served as a member of the Board of Directors of Lineage Cell Therapeutics, formerly known as BioTime, Inc., a clinical stage biotechnology company focused in the field of regenerative medicine. From 2008 to 2009, Mr. Farrell served as the Executive Vice President and Chief Financial Officer for Stream Global Services, a business process outsourcer. From 1999 to 2007, Mr. Farrell served as President of PolyMedica Corporation, a publicly traded provider of diabetes supplies that was acquired by Medco Health Solutions in 2007. From 2007 to 2014, he served as a member of the Board of Directors of Questcor Pharmaceuticals, a biopharmaceutical company that was acquired by Mallinckrodt PLC in 2014. Mr. Farrell spent five years as a Senior Manager at PricewaterhouseCoopers auditing leading public companies from 1994 to 1999. He received his B.A. from Harvard University and earned a M.B.A. at the University of Virginia, Darden School of Business.
>
> *Qualifications.* The Board of Directors concluded that Mr. Farrell should serve on the Board of Directors because he brings significant operating, financial and board experience to STAAR. He has a strong knowledge of healthcare, having led PolyMedica and Convey Health Solutions, and having served as Chairperson of the Audit and Corporate Citizenship Committees for Questcor Pharmaceuticals and Lineage Cell Therapeutics, and also would qualify as a financial expert. His expertise in healthcare distribution, accounting and financial stewardship will add a valuable skill set and strategic perspective to our Board.

39.     Upon information and belief, Defendant Farrell is a citizen of the State of California.

**Defendant Moore**

40.     Defendant John C. Moore ("Moore") serves on the Board of STAAR, and also serves as a member of the Audit Committee and Compensation Committee. According to the Company's 2020 Proxy Statement, as of June 1, 2020, Defendant

Moore beneficially owned 179,178 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 1, 2020 was $39.73, Defendant Moore owned approximately $7.1 million worth of STAAR stock.

41.    The Company's 2020 Proxy Statement stated the following about Defendant Moore:

> *Background.* From December 2012 through December 2016, Mr. Moore served as a director and Chairperson of the Board of Directors of Optovue, Inc., an ophthalmic medical device company. From May 2014 through December 2018 Mr. Moore served as Chief Technical Officer of TearSolutions, Inc., a company focused on a natural replacement therapy for dry eyes. Since December 2018 he has served as a Board Observer at TearSolutions. Between April 2005 and January 2007, Mr. Moore served as Chief Executive Officer of Notal Vision, an Israel-based ophthalmic company that develops diagnostic solutions for the early detection and monitoring of age-related macular degeneration (AMD). Mr. Moore served as the President and Chief Executive Officer of Laser Diagnostic Technologies, a manufacturer of ophthalmic diagnostic laser devices used for the early detection of glaucoma, from 2000 until 2004 when it was acquired by Carl Zeiss Meditec, Inc. Before this, Mr. Moore was a vice president at Alcon Laboratories, one of the largest companies in the ophthalmic surgical sector, where he was responsible for pursuing and executing strategic acquisitions and partnerships to broaden that company's product portfolio. Mr. Moore also spent more than 10 years in various leadership roles at Carl Zeiss, Inc., a multinational ophthalmic company with primary businesses in optics, medical, scientific and semiconductor products. Mr. Moore received his B.S. in General Science from University of Rochester.

> *Qualifications.* Mr. Moore's extensive experience in the ophthalmic and medical device industries encompasses both large, well established companies and innovative start-ups. The Board of Directors concluded that Mr. Moore should serve on the Board of Directors because of his familiarity with relevant technical aspects of the ophthalmic industry and the challenges faced by emerging companies in the ophthalmic sector. Throughout his tenure as a STAAR director, Mr. Moore has been an important resource for the Board of Directors, contributing valuable insights in numerous areas, including research and development and international operations in the medical device industry.

42.     Upon information and belief, Defendant Moore is a citizen of the State of California.

**Defendant Silverman**

43.     Defendant Louis E. Silverman ("Silverman") has served on the Board of STAAR since September 2014, and also serves as Chairman of the Board, Chairman of the Compensation Committee, and as a member of the Nominating and Governance Committee. According to the Company's 2020 Proxy Statement, as of June 1, 2020, Defendant Silverman beneficially owned 88,046 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 1, 2020 was $39.73, Defendant Silverman owned approximately $3.5 million worth of STAAR stock.

44.     The Company's 2020 Proxy Statement stated the following about Defendant Silverman:

> *Background*. Since February 2014, Mr. Silverman has served as the Chairperson and Chief Executive Officer of privately held Advanced ICU Care, Inc., a health care services company providing tele-ICU monitoring services to hospitals. From June 2012 through February 2014, Mr. Silverman served as a consultant and Board advisor for private equity investors and others regarding health care technology and health care technology service companies, and health care services portfolio investments. From September 2009 through June 2012, Mr. Silverman was Chief Executive Officer of Marina Medical Billing Services, Inc., a revenue cycle management company serving ER physicians nationally. Previously, from September 2008 through August 2009, Mr. Silverman served as President and Chief Executive Officer of Qualcomm-backed health care start-up LifeComm. From August 2000 through August 2008, Mr. Silverman served as the President and Chief Executive officer of Quality Systems, Inc., a publicly traded developer of medical and dental practice management and patient records software. From 1993 through 2000, he served as Chief Operating Officer of CorVel Corporation, a publicly traded national managed care services/technology company. Mr. Silverman earned a B.A. from Amherst College and an M.B.A. from Harvard Business School.
>
> *Qualifications*. The Board of Directors concluded that Mr. Silverman should serve on the Board of Directors because he brings to the Board of Directors senior executive experience in leadership and corporate strategy from various healthcare technology and services companies.

45.     Upon information and belief, Defendant Silverman is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers, directors, and/or fiduciaries of STAAR and because of their ability to control the business and corporate affairs of STAAR, the Individual Defendants owed STAAR and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage STAAR in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of STAAR and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to STAAR and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of STAAR, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties the officers and directors of STAAR were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company  as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of STAAR, the absence of good faith on their part, or a reckless disregard for their duties to

the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised STAAR's Board at all relevant times.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

52.     To discharge their duties, the officers and directors of STAAR were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of STAAR were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to STAAR's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how STAAR conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of STAAR and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that STAAR's operations would comply with all applicable laws and STAAR's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to STAAR and the shareholders the duty of loyalty requiring that each favor STAAR's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of STAAR and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with STAAR, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by STAAR.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the

actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of STAAR was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of STAAR and was at all times acting within the course and scope of such agency.

## STAAR'S CODE OF ETHICS

62.     The Company has adopted a Code of Ethics that applies to all directors, officers and employees of the Company worldwide, including employees of STAAR's subsidiaries.

63.     STAAR adopted the Code of Ethics to implement its policies of (i) "requir[ing] high standards of business ethics and integrity on the part of all employees"; and (ii) "comply[ing] with all applicable laws and regulations in the conduct of its business."

64.     According to the Code of Ethics, in a section titled "Compliance with Laws and Internal Policies," the Company "requires that all employees, officers and directors comply with all laws, rules and regulations applicable to the Company wherever it does business. [STAAR expects those bound by the Code of Ethics] to use good judgment and

common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them."

65.    In a section titled, "Conflicts of Interest," the Code of Ethics stated the following, requiring any such conflicts to be reported:

- Avoid any relationship that might impair, or even appear to impair, the proper performance of your STAAR-related responsibilities.
- Avoid any situation that might affect your independence of judgment with respect to any business dealings between STAAR and any other organization or individual.

66.    The Company listed as examples number of ways in which a conflict of interest could arise.

67.    The "Mandatory Disclosure" section of the Code of Ethics further stated the following:

> STAAR may be suspended and/or debarred as a government contractor for a knowing failure by a principal to timely disclose to the government, in connection with the award, or performance, credible evidence of:

- a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code;
- a violation of the civil False Claims Act; or
- credible evidence of a significant overpayment, other than overpayments resulting from contract financing payments as defined in FAR 32.001.

68.    In a section titled, "Honest and Ethical Conduct and Fair Dealing," the Code of Ethics stated the following:

- We should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees.
- Statements regarding STAAR's products and services or otherwise must not be untrue, misleading, deceptive or fraudulent.

- You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

69.     In a section titled, "Insider Trading," the Code of Ethics prohibited the following:

- We are prohibited from engaging, or assisting others in engaging, in any transactions involving STAAR securities, or the securities of any other entity with whom the STAAR is engaged (such as suppliers or customers), or with whom STAAR will be engaged, in a business transaction, while you are in possession of any material confidential information about STAAR or the other entity (meaning information that significantly affects, or would reasonably be expected to have an effect on, the market price or value of STAAR's securities).
- You are also prohibited from communicating such confidential information to others who might trade securities on the basis of that information.

70.     The Code of Ethics also has a section titled "Accuracy of Books and Records and Public Reports," setting forth the following:

- We must honestly and accurately report all business transactions.
- You are responsible for the accuracy of your records and reports. Accurate information is essential to STAAR's ability to meet legal and regulatory obligations.
- All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of STAAR must conform to generally accepted accounting rules and STAAR's accounting policies.
- No undisclosed or unrecorded account or fund shall be established for any purpose.
- You must not make any false or misleading entries in STAAR's books or records for any reason.
- No disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.
- It is STAAR's policy to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission ("SEC") and in other public communications.

71.     Regarding "Business Ethics," the Code of Ethics stated, in relevant part, the following:

- STAAR will strive to meet its objectives, but will never compromise its ethics.

19

Verified Shareholder Derivative Complaint

- Each of us must promote honest and ethical conduct.

72.     The Code of Ethics further stated, regarding "Manager Responsibilities," as follows:

- All STAAR business leaders and managers must show a commitment to our culture of integrity through their actions.
- All STAAR business leaders and managers also must promote an environment where compliance is expected and ethical behavior is the norm.
- All employees must comply with STAAR's policies and principles.
- No one should ask a STAAR employee to break the law, or go against STAAR's principles, policies and procedures.

73.     In a section titled, "Protection and Proper Use of Company Assets," the Code of Ethics maintained that, "We should all protect STAAR's assets. Theft, carelessness and waste have a direct impact on STAAR's financial performance."

74.     The Individual Defendants violated STAAR's Code of Ethics by engaging in or permitting the schemes to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, and failing to report the same. Moreover, Defendant Andrews violated the Code of Ethics by engaging in insider trading. In further violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and act in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     STAAR is a surgical eye Company that designs, develops, manufactures, and sells implantable lenses. The Company touts itself as the leading manufacturer of lenses used globally in corrective or "refractive" surgeries, as well as in cataract surgeries.

76. The Company generates all of its sales from its one business segment, ophthalmic surgical products. The Company has two primary products: ICLs (for refractive surgery) and IOLs (for cataract surgery).

77. STAAR makes ICLs for certain correct severe myopia (nearsightedness), but the procedure is about three times as expensive as LASIK. High out of pocket costs discourage only those with severe vision problems from getting ICL surgery.

78. Not surprisingly, then, the Company has struggled to make profits outside of China, and its Compound Annual Growth Rate ("CAGR") outside of China has only been 5% over the last decade.

79. However, over the same ten years, STAAR's CAGR in China was stated to be 37%.

80. Focusing on China, analysts from J Capital Research looked into STAAR's worldwide operations and concluded that the Company's sales in China were overstated by about 33%. Moreover, those fake sales would have become profit, such that the $21.5 million in overstated sales represented 152% of the Company's total profit—meaning that without the fake Chinese sales, **STAAR was actually losing money**.

81. Throughout the Relevant Period, STAAR's independent auditor has been BDO USA, LLP, but neither the American nor Chinese arms of BDO were able to audit STAAR's sales in China.

**False and Misleading Statements**

***February 26, 2020 Press Release***

82. On February 26, 2020, the Company issued a press release which was also attached to its Form 8-K signed by Defendant Mason and filed with the SEC the same day, announcing its financial results for the fourth quarter and fiscal year ended January 3, 2020.

83. STAAR reported that full year "Record Net Sales of $150.2 Million" had increased by 21% year-over-year, ICL sales were up 28% year-over-year, gross margins

had improved to 74.5% of sales compared to 73.8% of sales the prior year, and full year net income had increased $0.30 per share versus prior year net income of $0.11 per share.

84.    Defendant Mason stated, in relevant part:

> We closed 2019 with strong fourth quarter results leading to full year performance above our committed targets for ICL unit growth, total revenue growth, cash generation and earnings per share. STAAR entered 2020 with continued financial and operating momentum. We achieved progress on our clinical and regulatory strategic imperatives with a new CE Mark approval for use of our ICL as a supplemental lens and the first patient implant in our U.S. EVO clinical trial . . . . 27% ICL unit growth for the fourth quarter included Japan up 95%, China up 43%, Germany up 29%, Spain up 20%, India up 16% and the U.S. up 10% as compared to the prior year period. As with many other companies, we are assessing and managing through the potential impact of the coronavirus on our business in China and elsewhere. Our thoughts are with all those who have been or may become impacted globally by the coronavirus. We have been directly in touch with and have been working with our China customers. Our customers have experienced a mandated pause in procedures during the month of February and our ICL unit volume will be impacted in the first quarter. We currently expect a potential $5 million to $7 million delay in sales orders. The STAAR China team has been engaged in an extensive remote customer outreach program that includes digital training courses. For example, during the week of February 10th, STAAR China had more than 2,500 healthcare professionals participate in online training. Attendees included roughly 500 ophthalmic surgeons, as well as nurses, examiners and ICL specialists. We understand that our customers are hopeful to resume robust clinical activities, including implantation of the EVO ICL family of lenses, in March. Excluding any potential full year impact from the coronavirus, at this time we are maintaining our full year sales outlook.

### February 26, 2020 Form 10-K

85.    On February 26, 2020, STAAR filed its annual report on a Form 10-K, for the fiscal year ended January 3, 2020 (the "2019 10-K") which was signed by Defendants Mason and Andrews and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mason and Andrews attesting to the accuracy of the 2019 10-K.

86.   STAAR reported in the 2019 10-K that "[o]ne customer, Shanghai Lan[g]sheng,[2] our China distributor who sells in to [sic] China and Hong Kong, accounted for more than 43% of our consolidated net sales during fiscal 2019." STAAR represented that net sales to Shanghai Lansheng for the three fiscal years were as follows:

| Net Sales to Shanghai Langsheng | | |
| --- | --- | --- |
| Fiscal Year | Net Sales ($, in thousands) | Net Sales as Percentage of Consolidated Net Sales |
| 2019 | $ 64,820 | 43.2% |
| 2018 | $ 46,070 | 37.2% |
| 2017 | $ 24,473 | 27.0% |

87.   STAAR further reported in the 2019 10-K that its "[m]arketing and selling expenses for 2019 were $45.5 million, an increase of 17.9% when compared with $38.6 million for 2018," which were an increase of 35.9% when compared to expenses of $28.4 million in 2017. STAAR explained that the 2019 "increase in marketing and selling expenses" was "due to an increase in headcount and salary-related expenses including stock-based compensation and continuing investments in digital, consumer, and strategic marketing, and travel expenses." STAAR further stated that:

> We also enter into certain strategic cooperation agreements with customers in which, as consideration for certain commitments made by the customer, including minimum purchase commitments, we agree, among other things, to pay for marketing, educational training and general support of our products. The provisions in these arrangements allow for these payments to be made directly to the customer or payments can be made directly to a third party for distinct marketing, educational training and general support services provided to or on behalf of the customer by the third party. For payments we make to another party, or reimburse the customer for distinct marketing and support services, we recognize these payments as sales and marketing expense as incurred. These strategic cooperation agreements are generally for periods of 12 months or more with 8 27.0 quarterly minimum purchase commitments.

---

[2] The correct spelling is Lansheng.

88.     STAAR further reported in the 2019 10-K that the Company had incurred "Research and development" expenses for the 2019 fiscal year of $25.298 million, an increase of approximately 14.8% from $22.028 million in the prior year. Additionally, "[r]esearch and development expense consist[s] primarily of compensation and related costs for personnel responsible for the research and development of new and existing products, the regulatory and clinical activities required to acquire and maintain product approvals globally and medical affairs expenses. These costs are expensed as incurred."

**April 13, 2020 Press Release**

89.     On April 13, 2020, the Company issued a press release which was also attached to its Form 8-K signed by Defendant Mason and filed with the SEC the same day, to provide a COVID-19 business update. STAAR announced:

> STAAR expects total net sales for the first quarter ended April 3, 2020 to be approximately $34.9 million, up approximately 7% as compared to the prior year period. The Company estimates COVID-19 negatively impacted first quarter sales by approximately $4 million, less than previously estimated. Despite the pandemic's impact on business, first quarter ICL unit growth is expected to be up approximately 9% with strong performance in Japan, Korea, Canada, Germany and the rest of Asia Pacific countries not including China. China's growth was up 7% due to a strong January and ordering resuming in the final two weeks of the quarter. Implant rates in China were up significantly in the past two weeks.

**May 6, 2020 Press Release**

90.     On May 6, 2020, the Company issued a press release which was also attached to its Form 8-K signed by Defendant Mason and filed with the SEC the same day, announcing STAAR's financial results for the first fiscal quarter ended April 3, 2020. STAAR reported net sales of $35.2 million, up 8% from the prior year quarter, and ICL sales of $29.3 million, up 6% from the prior year quarter. STAAR further stated that "[w]e started 2020 off with the highest ICL sales and unit growth experienced in the last five years for a January. In our major markets which remained open that trend continued into the middle of March. The large Asian markets, China, Japan, and South Korea are all growing well now."

*May 6, 2020 Form 10-Q*

91.     On May 6, 2020, the Company filed with the SEC its quarterly report for the first fiscal quarter of 2020 ended April 3, 2020 on Form 10-Q (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Andrews, and contained SOX certifications signed by Defendants Mason and Andrews attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

92.     STAAR stated in the 1Q20 10-Q that "[o]ne customer, the Company's distributor in China, accounted for 33% and 36% of net sales for the three months ended April 3, 2020, and March 29, 2019, respectively. As of April 3, 2020 and January 3, 2020, respectively, one customer, the Company's distributor in China, accounted for 48% and 43% of consolidated trade receivables." The Company further reported that "ICL units increased 9% over the prior year quarter, including . . . growth in China of 7%."

93.     The "marketing and selling" expense for the quarter was reported to be $11.028 million, up from $10.143 million in the prior year first quarter. STAAR also reported that its "research and development" expense was $6.898 million, up from $5.635 million in the prior year first quarter.

*May 6, 2020 Registration Statement*

94.     Also on May 6, 2020, STAAR filed a Form S-3 Registration Statement (the "Registration Statement") with the SEC for a $200 million mixed shelf offering.

95.     The Registration Statement stated: "Manufacturing and selling lenses used in refractive surgery accounted for approximately 86% of our total sales in 2019 and is our fastest growing source of revenue."

*2020 Proxy Statement*

96.     On June 8, 2020, the Company filed the 2020 Proxy Statement. Defendants Farrell, Mason, Moore, and Silverman solicited the 2020 Proxy Statement filed pursuant

to Section 14(a) of the Exchange Act which contained material misstatements and omissions.[12]

97.   The 2020 Proxy Statement stated, regarding the Company's compensation program:

> Compensation Philosophy and Process. The Company is dedicated to pursuing a mix of near, medium, and longer-term business objectives designed to build and increase shareholder value. Our Board and Compensation Committee have sought to establish a compensation program that incentivizes and rewards our management team for achieving or exceeding corporate financial and non-financial goals and also individual objectives. In the Committee's deliberations on the Company's compensation programs, management, other than the Chief Executive Officer, is involved only to the extent of providing Company performance and market information. Our Chief Executive Officer does not participate in the determination of her own compensation, but she joins with the full Board of Directors in the determination of compensation of other named executive officers.

98.   The 2020 Proxy Statement explained that the Company would hold a non-binding advisory vote to approve STAAR's compensation of its named executive officers at the annual meeting on July 30, 2020.

99.   However, with regard to the compensation program, the 2020 Proxy statement was false and misleading because it failed to disclose that the shares and value of STAAR were artificially inflated, rendering the executive compensation undeserved and excessive and the shareholders unable to make informed votes.

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

100.   Furthermore, the statements in the 2020 Proxy Statement were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that the Company was (1) overstating its sales and growth in China, which profits were being hidden as (2) overstatements of marketing and research and development expenses, and (3) that the Company failed to maintain internal controls. As a result of the foregoing, Defendants' public statements during the Relevant Period were materially false and misleading.

101.   The statements in ¶¶ 84-95; 97; 99 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that the Company was (1) overstating its sales and growth in China, which profits were being hidden as (2) overstatements of marketing and research and development expenses, and (3) that the Company failed to maintain internal controls. As a result of the foregoing, STAAR's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

102.   On August 5, 2020, after the markets closed, STAAR reported financial results for the second quarter of 2020 ended July 3, 2020, on a Form 10-Q ("the 2Q20 10-Q") and accompanying press release on Form 8-K. The 2Q20 10-Q was signed by Defendant Williams, and contained SOX certifications signed by Defendants Mason and Williams attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.   The Company reported net sales of $35.2 million (down 11% from the prior year quarter), and ICL sales of $30.7 million (down 11% from the prior year quarter).

STAAR reported a ***net loss*** of $0.03 per share, versus net income of $0.08 per share in the prior year quarter.

104.   STAAR further reported in the 2Q20 10-Q that "the Company's distributor in China, accounted for 53% and 43% of net sales for the three and six months ended July 3, 2020, respectively, and the same customer, accounted for 49% and 43% of net sales for the three and six months ended June 28, 2019, respectively. As of July 3, 2020 and January 3, 2020, respectively, one customer, the Company's distributor in China, accounted for 57% and 43% of consolidated trade receivables."

105.   On this news, the price of the Company's stock dropped from $61.81 per share at the close of the previous trading day on August 5, 2020, to $55.86 per share at the close of trading on August 6, 2020, a drop of almost 10%.

106.   Then, just a few days later, on August 11, 2020, J Capital Research published the J Capital Report disclosing STAAR had misstated its sales in China such that ***all of its $14 million in profits for 2019 were fake***. The report stated: "[w]e think that STAAR Surgical has overstated sales in China by at least one-third, or $21.6 [million]. That would mean that all of the company's $14 [million] in 2019 profit is fake." Further, "***[f]ake sales [in China] come at 100% margins and therefore translate directly into profit.*** That means that the roughly $21.6 [million] in overstated Chinese sales in 2019 represent 152% of total company profit. In other words, ***without the fraud that we believe pervades the China business, STAAR is losing money***." (Emphasis added.)

107.   The analysts' conclusion that STAAR's ICL sales were "dramatically overstated" was based on over 75 interviews, visits to the Company's sites in both China and Switzerland, and a review of the financial statements and other governance documents for STAAR's distributors and customers in China.

108.   Specifically, the J Capital Report July 2020. stated in relevant part:

STAAR has not said much to investors about its largest client, Aier. It has posted a public notice in some Aier clinics stating that Aier has been the largest ICL partner each year since 2015. We spoke to a dozen people familiar with STAAR's sales in China, and they agreed that the STAAR sales numbers assume that 65,000-75,000 lenses—half the volume sold in China—were sold to Aier Eye Hospital Group . . . in 2019. But Aier's public financial statements indicate that its purchases from STAAR should be no more than 41,192 lenses, 43% fewer than our interviewees told us. Based on Aier's 2019 annual report and our interviews with Aier management, we estimate that Aier performed at most 20,596 ICL surgeries in 2019. . . . If all the surgeries involved two lenses, then STAAR sold at most 41,192 lenses to Aier in 2019, not the 65,000-75,000 that Lansheng and STAAR China told us. . . . For 41,192 lenses, that would mean $20.2 mln in revenue to STAAR in 2019, not the $32.4 mln that would represent half of China revenues.

\* \* \*

Aier has ample means to obfuscate its lens purchases. We learned in an interview with an Aier executive that the company has a subsidiary at a non-existent address in Tibet that is dedicated to processing purchases of STAAR lenses. This company, called Shannan Youshi . . . pays STAAR for lenses and takes payment from the Aier hospitals, with little scrutiny of accounts . . . . We asked a photographer to visit the premises, but the address does not exist. We telephoned the registered phone number, and it was a non-working number.

\* \* \*

STAAR compensates for this sales inflation, we believe, with the marketing budget, which was $45.5 mln in 2019, 30% of sales. We spoke with sales and marketing executives in China, in the U.S., and in Europe as well as with former C Suite executives, and none could identify promotional spending nearing $45.5 mln a year. These executives, including longtime regional sales directors, told us they estimate that the company spends no more than a couple million dollars on marketing. . . . Instead, according to a highly placed former executive, STAAR inflates sales and then balances the "income" by marking up marketing costs. According to a former executive, marketing "subsidies" may be around one-third the stated value of the lens, so that the distributor buys the lens at $300 but STAAR books the sale at $450 and in order to hide the phantom revenue allocates the $150 to marketing. This means that STAAR is able to toggle sales at will using its marketing budget.

\* \* \*

In May, we spoke with a Lansheng former who is in regular touch with former colleagues. This former executive estimated that Q1 sales were down 30% YoY in terms of volume and that Q2 would be more or less flat with Q2 2019.

\* \* \*

A current Lansheng employee estimated that Q1 sales had dropped by at least one-third.

\* \* \*

Inquiries with Lansheng and STAAR employees indicated that Lansheng in H1 was carrying substantially less than its usual

inventory because of concerns that the coronavirus would make the lenses unsaleable. A Lansheng former also said that STAAR was worried that receivables could go unpaid.

109.  The J Capital Report also explained that there were missing exports from Switzerland, which is the source of all of STAAR's products sold in China. Specifically, the J Capital Report stated: "Swiss records showing exports of implantable contact lenses to China indicate sales far lower than those claimed by STAAR."

110.  Further, the J Capital Report explained that STAAR could "be producing fewer lenses than it claims" and that "[i]nventories have actually declined over five years despite a 95% increase in income." Indeed, according to STAAR formers who spoke with J Capital, "they have not seen the increase in manufacturing activity that would support the reported 41% sales growth. No one, including former managers who worked within STAAR's manufacturing facility in Monrovia, can say what the unit production volume is."

111.  The J Capital Report further stated, in relevant part:
Asia was gut punched by Covid-19, but STAAR reported growth. As usual, the company relied on China for the bit of good news it had to offer. In Q2 [2020], China distributor Lansheng accounted for 53% of sales and 57% of trade receivables. For the first half [of 2020], STAAR said that Chinese unit sales rose by 7% and revenue declined by 2.7%, suggesting sharp discounts. In fact, several eye clinics told us that they were discounting ICL surgery, usually by about 15%.

But we interviewed 19 doctors, distributors, and marketing platforms that promote eye surgery. They said that the number of ICL procedures in China from January through June had declined by around 50-60%. Chinese clinics were closed for at least two months, sometimes more.

112.  Indeed, as stated in the J Capital Report, "Lansheng represents 100% of sales in China. If both sales and inventory were down, it is ***impossible*** that China sales grew." (Emphasis added.)

113.  Strangely, Lansheng is not only STAAR's distributor, but also accounts for 100% of STAAR's sales in China. According to the J Capital Report, Lansheng's Chairman, Zhang Jian, bought the medical-equipment piece of a state-owned enterprise in 2008, when STAAR had just entered the Chinese market. J Capital Research explained

that "[i]n Q4 2015, STAAR gave up on doing direct sales and handed import and distribution to Lansheng." However, as noted in the J Capital Report:

> Shortly after signing with STAAR, Zhang Jian spirited the STAAR distribution business into a separate company registered in the British Virgin Islands. He used that BVI, called Visiontec, to establish a Shanghai shadow company whose English name is the same as Lansheng's. Although the two Lanshengs are owned by the same person, they are not the same company, but STAAR has never made a new disclosure.

114.   On this news, the price of the Company's stock continued to fall almost 6.2%, from $51.42 per share at the close of the previous trading day on August 10, 2020, to $48.25 at the close of trading on August 11, 2020.

## DAMAGES TO STAAR

115.   As a direct and proximate result of the Individual Defendants' conduct, STAAR has lost and expended, and will lose and expend, many millions of dollars.

116.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, current CFO, and former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and in connection to the internal control failures.

117.   Additionally, these expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

118.   As a direct and proximate result of the Individual Defendants' conduct, STAAR has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

119.   Plaintiff brings this action derivatively and for the benefit of STAAR to redress injuries suffered, and to be suffered, as a result of the Individual Defendants'

breaches of their fiduciary duties as directors and/or officers of STAAR, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

120.    STAAR is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.    Plaintiff is, and has continuously been at all relevant times, a shareholder of STAAR. Plaintiff will adequately and fairly represent the interests of STAAR in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

123.    A pre-suit demand on the Board of STAAR is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Mason, Farrell, Moore, and Silverman (the "Director-Defendants"), and non-parties Thomas G. Frinzi and Gilbert H. Kliman, M.D. Plaintiff needs only to allege demand futility as to four of the six Directors that were on the Board at the time this action was commenced.

124.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in making

and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants through their false and misleading statements and omissions, the Individual Defendants caused the Company to repurchase its own stock. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.    Additional reasons that demand on Defendant Mason is futile follow. Defendant Mason has served as the President and CEO of STAAR since March 1, 2015, and has been on the Board since 2014. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Mason with her principal occupation, and she receives handsome compensation, including an annual salary of $525,000.

127.    As the Company's highest officer and a trusted Company director, she conducted little, if any, oversight of the Company's scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Mason was on the Company's Board throughout the duration of the Relevant Period, and thus was aware of and approved the false and misleading statements. Defendant Mason also signed, and thus personally made the false and misleading statements in the Company's press releases on February 26, 2020, April 13, 2020, and May 6, 2020, and in the 2019 10-K, the 1Q20 10-Q, and the 2Q20 10-Q. Furthermore, Defendant Mason is a defendant in the Securities Class Action. For these reasons too, Defendant Mason breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Farrell is futile follow. Defendant Farrell has served on the board since January 2016. Defendant Farrell also serves as Chairman of Audit Committee and as a member of Nominating and Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Farrell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129. Additional reasons that demand on Defendant Moore is futile follow. Defendant Moore serves on the Board of STAAR, and also serves as a member of the Audit Committee and Compensation Committee. The Company provides Defendant Moore with his principal occupation. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on Defendant Silverman is futile follow. Defendant Silverman has served on the Board of STAAR since September 2014. He also serves as Chairman of the Board, Chairman of the Compensation Committee, and as a member of the Nominating and Governance Committee. The Company provides Defendant Silverman with his principal occupation. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Silverman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.   Additional reasons that demand on the Board is futile follow.

132.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

133.   Defendants Farrell, Moore, and Silverman (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, conflicts of interest, compliance with legal and regulatory requirements, the Company's internal control functions, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

134.   In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law. In violation of the Code of Ethics, the Director-Defendants failed to comply with the law.

Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

135.   STAAR has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for STAAR any part of the damages STAAR suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

136.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

137.   The acts complained of herein constitute violations of fiduciary duties owed by STAAR's officers and directors, and these acts are incapable of ratification.

138.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of STAAR. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of

the officers of STAAR, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

139.   If there is no directors' and officers' liability insurance, then the Directors will not cause STAAR to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

140.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against Individual Defendants for
### Violations of Section 14(a) of the Exchange Act

141.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

143.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to

permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

144. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

145. Under the direction and watch of the directors, the 2020 Proxy Statement failed to disclose, *inter alia*, that the Company was overstating its sales and growth in China, and was hiding the fake profits as overstatements of marketing and research and development expenses. As a result, the Company's statements regarding STAAR's business, operations, compliance, and prospects were materially false and misleading. Moreover, the 2020 Proxy Statement represented that the Company purported to employ "pay-for-performance" elements designed to link executive compensation to shareholders' interests while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. This caused the compensation to executives to be excessive and undeserved. Further, because the shareholders were unaware of the truth, their advisory votes on the executive compensation amounts were uninformed.

146. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including, but not

limited to, election of directors, ratification of an independent auditor, and the advisory approval of executive compensation.

147. The false and misleading elements of the 2020 Proxy Statement led to the ratification of BDO USA, LLP as the Company's independent auditor and the re-election of Defendants Farrell, Mason, Moore, and Silverman, which allowed them to continue breaching their fiduciary duties to STAAR.

148. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

149. Plaintiff on behalf of STAAR has no adequate remedy at law.

## SECOND CLAIM
**Against Individual Defendants Mason, Andrews, and Williams for Contribution Under Sections 10(b) and 21D of the Exchange Act**

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

151. STAAR, along with Defendants Mason, Andrews, and Williams are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mason, Andrews, and Williams' willful and/or reckless violations of their obligations as officers and/or directors of STAAR.

152. Defendants Mason, Andrews, and Williams, because of their positions of control and authority as officers and/or directors of STAAR, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of STAAR, including the wrongful acts complained of herein and in the Securities Class Action.

153.  Accordingly, Defendants Mason, Andrews, and Williams are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

154. As such, STAAR is entitled to receive all appropriate contribution or indemnification from Defendants Mason, Andrews, and Williams.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

155.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of STAAR's business and affairs.

157. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

158. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of STAAR.

159. In breach of their fiduciary duties owed to STAAR, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that its sales in China were overstated, which meant that its marketing and research and development expenses were overstated, that ***all of its profits in 2019 were fake***, and that its internal controls were inadequate. As a result, the Company's statements regarding STAAR's business, performance, and prospects were materially false and misleading.

160.  The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

161.  Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

162.  The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of STAAR's securities.

163.  The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of STAAR's securities.

164.  These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

165. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, STAAR has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166.  Plaintiff on behalf of STAAR has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

167.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, STAAR.

169.  The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from STAAR that was tied to the performance or artificially inflated valuation of STAAR, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

170.  Plaintiff, as a shareholder and a representative of STAAR, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

171.  Plaintiff on behalf of STAAR has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

172.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

173.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence STAAR, for which they are legally responsible.

174.  As a direct and proximate result of the Individual Defendants' abuse of control, STAAR has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, STAAR has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.  Plaintiff on behalf of STAAR has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

176.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of STAAR in a manner consistent with the operations of a publicly-held corporation.

178.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, STAAR has sustained and will continue to sustain significant damages.

179.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

180.  Plaintiff on behalf of STAAR has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

181.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.  The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, stock grants, or other allowances and also caused the Company to pay out loans, among other inappropriate things, to the detriment of the shareholders and the Company.

183.  As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused STAAR to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

184.  As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

185.  Plaintiff on behalf of STAAR has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of STAAR, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to STAAR;

(c)    Determining and awarding to STAAR the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing STAAR and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect STAAR and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for

shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

   1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

   2.    a provision to permit the shareholders of STAAR to nominate at least three candidates for election to the Board; and

   3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

   (e)    Awarding STAAR restitution from the Individual Defendants, and each of them;

   (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

   Plaintiff hereby demands a trial by jury.

Dated: December 31, 2020                Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        By: */s/ Laurence M. Rosen*
                                        Laurence M. Rosen, Esq. (SBN 219683)
                                        355 S. Grand Avenue, Suite 2450
                                        Los Angeles, CA 90071
                                        Telephone: (213) 785-2610
                                        Facsimile: (213) 226-4684
                                        Email: lrosen@rosenlegal.com

                                        **THE BROWN LAW FIRM, P.C.**
                                        Timothy Brown

45
Verified Shareholder Derivative Complaint

240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Amir Sitabkhan am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

12/30/2020

DocuSigned by:

*Amir Sitabkhan*

5E45E6B1C40B431...

Amir Sitabkhan